Filed 4/17/23  In re W.R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re W.R., a Person Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MELVIN R.,<br><br>Defendant and Appellant. | F084912<br><br>(Super. Ct. No. 21JD0021)<br><br>**OPINION** |
| In re W.R., a Person Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JENNIFER H.,<br><br>Defendant and Appellant. | F085119<br><br>(Super. Ct. No. 21JD0021) |

APPEAL from a judgment of the Superior Court of Kings County.  Jennifer Lee Giuliani, Judge.

Gregory M. Chappel, under appointment by the Court of Appeal, for Defendant and Appellant Melvin R.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant Jennifer H.

Diane Freeman, County Counsel, Risé A. Donlon and Thomas Y. Lin, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellants Jennifer H. (mother) and Melvin R. (father) are the parents of now nine-year-old W.R. (the child), who is the subject of a dependency case.  Mother challenges the juvenile court's orders issued at a contested Welfare and Institutions Code section 366.26[1] hearing that resulted in mother's parental rights being terminated.  Mother contends the juvenile court erred in finding W.R. adoptable and considering improper factors in relation to the beneficial parent-child relationship exception.  Mother also argues that the juvenile court erred in denying her section 388 petition for further reunification services without an evidentiary hearing.  Father joins in mother's arguments.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

*Initial Removal*

On February 21, 2021, the Kings County Human Services Agency (agency) received a referral after the child was admitted into Valley Children's Hospital (hospital) due to a seizure.  The child was identified as a nonverbal, gastrostomy tube (g-tube)

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] Father withdrew the arguments in his opening briefing regarding alleged errors related to compliance with the Indian Child Welfare Act.

2.

dependent, and developmentally delayed child with a history of seizures. The child's weight classified her as "failure to thrive" at the 22nd percentile, and concerns were expressed that mother did not understand the extent of the child's delays or appropriate g-tube feeding procedures. Her current glucose level indicated that she was not being fed, which put her at risk for seizures.

A social worker responded to the hospital and met with mother at the child's hospital room. Mother was not consistently engaged with the social worker during the meeting, and she failed to answer the social worker's questions for long periods of time. The child's glucose levels were estimated to be 42 at the time emergency services transported the child to the hospital. Mother indicated a healthy level is between 75 and 100, but she denied having the means to monitor the child's glucose levels. Mother claimed she was unaware of the cause of the child's seizure, and she suggested the child may have become diabetic due to her seizure medication, Keppra.

The child had approximately three seizures since being prescribed Keppra in January. Mother responded, " 'millions of children have seizures all over the world,' " when the social worker asked if mother was concerned about her daughter's seizures. Mother expressed feeling "overwhelmed" as she attended to the needs of the child, the child's sibling, and father. The child removed her g-tube on January 30, 2021, which required mother to take her to the hospital. The child's recommended diet consisted of five cans of "PediaSure" per day.

At that time, the child tested positive for pneumonia and COVID-19, and mother reported the child's appetite changed following the illness. The child became fussy and did not want to eat. The Central Valley Regional Center (CVRC) recently began having contact with the family, and mother recently discontinued participating in bi-weekly therapy. Mother did not want additional services from the agency because she felt it would be overwhelming to her.

On the following day, a social worker spoke with the reporting party on the phone to gather additional information. The reporting party discovered that mother had not followed up with appointments for a cardiologist for the last two years, and the child had a heart murmur. Mother also failed to follow up with a neurologist to determine if the child had an underlying seizure disorder. The reporting party believed mother had cognitive delays due to concerning statements that mother would make. Mother was present with the child for the majority of the time, but the reporting party was unsure if the child was "too much for the mother to handle." The child's nurse was concerned that mother did not understand the severity of the child's condition, and mother denied knowing how to clean the child's g-tube.

An agency social worker met with father at the home of his adult daughter. Father did not know why the agency was involved, and he believed the child was in the hospital because she had the flu. He was unable to remember the child's medical condition, but he claimed she was " 'growing out of it.' " Father explained how the child had a seizure in her sleep, which was her third seizure. Mother was identified as the child's primary caretaker, and father rejected the social worker's suggestion that mother missed any medical appointments for the child. Father recently had a stroke, and a nurse came to help him twice per week. He was willing to cooperate with the agency and indicated the social worker could check on the family as long as she needed to. Father denied that either himself or mother had any mental health diagnoses or criminal history. Both mother and father smoked marijuana five or six times each week.

The social worker also interviewed the child's then nine-year-old brother, J.R., while father was present. J.R. helped mother with feeding the child, and J.R. believed the child had seizures when she did not eat. J.R. was worried about the child still being in the hospital and his father's cancer. Throughout the interview, J.R. appeared nervous, and the interview was terminated after father urinated while sitting in a nearby chair. Father's adult daughter explained that mother dropped father and J.R. off at her home

4.

when mother took the child to the hospital. The adult daughter was not able to assist the family due to her full-time job and family obligations.

To complete the investigation, and assist the family, the social worker contacted mother by phone. Mother acknowledged that the child had missed "some feedings" because she was not hungry when she had COVID-19. She claimed the child grunted when mother tried to feed her through her g-tube, which indicated the child was not hungry. The social worker eventually set an appointment to meet with mother at her home.

A nurse from the hospital informed the social worker by phone that an MRI ruled out any neurological concerns for the child. The child would remain in the hospital because she was underweight. The hospital had concerns with mother's credibility. The nurse was confused by mother's statement that the child was not hungry because she could not eat food orally. The child's occupational therapist walked into the hospital room and observed mother give the child a piece of shrimp. This was cause of concern because the child was diagnosed with an oral aversion that causes her to struggle with consuming food by mouth. Any attempts to feed the child were to be done with food in puree form because the child could choke on solid food. The nurse indicated she would have a doctor provide additional information regarding the child's condition.

Dr. Alexandria Curry contacted the social worker by phone to provide background for the child's medical condition. The child had an oral aversion and received a g-tube in 2017. Mother was advised to feed the child through the g-tube five times per day. A team of doctors would reconvene to determine the child's recommended amount of "PediaSure" if she did not gain weight with the appropriate nutrition in the hospital. The child was underweight for her age and diagnosed with failure to thrive. However, Curry did not believe the child would be considered failure to thrive if she was consistently receiving the appropriate amount of nutrition at home.

There were also concerns expressed by Curry that mother did not understand that she was responsible to provide the child with appropriate nutrition due to the child's developmental delays. It was reported that mother had a history of missing appointments, and mother admitted to lying about how often she had been feeding the child to medical staff. Mother admitted to missing one or two feedings per day because the feedings were "too stressful" and she was tired. Curry believed mother would continue to not feed the child consistently when mother felt overwhelmed or stressed.

On February 24, 2021, the social worker and law enforcement contacted mother at her residence to address the referral allegations. Mother acknowledged that she lied to doctors regarding the amount she was feeding the child because she was afraid to be honest. She claimed there was a lot on her plate when the child's missed feedings began. The child's feedings were not missed every day, and mother believed the child was not starving. She felt the child needed to be part of her own recovery and want to get better. Mother became angry as the social worker emphasized the child's failure to thrive diagnosis, and she stated, " '[the child] is not failing to thrive she . . . just gets really stressed.' " Law enforcement and the social worker determined that a protective hold would be placed on the child and J.R. (collectively, the children).

The agency filed a petition alleging the child was described by section 300, subdivision (b)(1). The petition alleged the child was at substantial risk of suffering serious physical harm as a result of the parents' failure to provide adequate medical care and nutrition to the child. The petition further alleged that there was a substantial risk that J.R. would be similarly neglected by the parents pursuant to section 300, subdivision (j). At the detention hearing held on March 1, 2021, the juvenile court ordered the children removed from their parents, and it set a combined jurisdiction and disposition hearing for March 22, 2021.

*Jurisdiction and Disposition*

The agency's jurisdiction and disposition report recommended that the allegations in an amended petition be found true, the children remain in out-of-home care, and family reunification services be provided to mother and father. The children were placed in separate resource family homes. The child's care provider was a nurse who works with developmentally delayed children, and she was trained to meet the child's needs. There were three sets of relatives interested in placement of the children, and the agency was assessing the relatives through the resource parent approval process.

The report noted the parents' prior child welfare history beginning with four referrals from May 2009 to May 2010 that were found to be inconclusive. The referrals involved allegations that mother left the child's siblings either without supervision or with unsafe persons while mother was using drugs or alcohol. In May 2013, there was a report that mother was overwhelmed and the child was at risk of failure to thrive in the weeks following her birth. An August 2013 referral alleged the child was hospitalized twice for failure to thrive at only three months of age. It was claimed that mother did not wake at night to feed the child, and mother believed that medical staff were " 'overly worried.' " The Alameda County Department of Children and Families initiated dependency proceedings in September 2013 after mother refused to bring the child to the hospital for her weight loss. The child received a "Nasal Gastro Tube" to administer her feedings, and she was returned to mother and father on a plan of family maintenance in October 2012. The dependency was terminated in January 2016.

The agency received a referral in August 2019 due to medical staff's concerns that mother did not seek timely medical treatment after the child pulled out her g-tube. The child had a g-tube since she was two years old, and mother claimed the g-tube came out accidentally. The referral was deemed inconclusive because the agency was unable to contact the family. On January 26, 2021, a referral was received regarding the child's suffering of seizures, and there were reported concerns that mother would not follow

7.

through with medical care. On February 4, 2021, the child was hospitalized after her g-tube was pulled out of her stomach. It was reported that the child was malnourished and mother appeared distraught. Both referrals were found to be inconclusive.

The agency received a phone call from hospital staff on February 26, 2021, and it was reported that mother stopped the child's feeding when no one was in the hospital room. Mother claimed something in the feeding bag would cause the child to become sick, and she believed the child was hospitalized due to COVID-19 and pneumonia. Hospital staff informed the agency that mother was not allowed to visit with the child at the hospital after she became confrontational and was asked to leave on February 26, 2021. Mother participated in a supervised visit with the children on March 12, 2021. Mother watched a movie with the children, and the visitation supervisor had to advise mother not to feed the child regular food.

In March 2021, mother was participating in therapy sessions by phone every two weeks, but she did not take any of her prescribed medications for mental health. She informed the social worker that the allegations were all lies and that she could feed and support her children. Mother was referred to providers for a mental health assessment and nurturing families class on March 17, 2021.

The jurisdiction and disposition hearing was eventually set for a contested hearing on April 2, 2021. An addendum report filed by the agency on March 30, 2021, indicated the child's care provider had no issues with the child's feedings. Father had to be reminded not to give the child regular food during a March 19, 2021 supervised visit. Mother completed a feeding through the child's g-tube during the visit. On March 26, 2021, mother refused to interact with an agency supervisor when the visitation supervisor questioned mother about the child chewing on something.

At the contested jurisdiction and disposition hearing held on April 2, 2021, mother testified that she was aware of the child's medical and developmental issues. She denied having any difficulty following medical advice for the child, and she claimed to only

8.

have difficulty with the child's feeding schedule when the child had COVID-19. Mother did not believe that the child's most recent seizure was related to improper feedings. She attributed the child's lack of weight gain to her developmental disability, and she described the child's weight gain as a "very slow process." Mother acknowledged that she was the child's sole care provider, and she was the only one feeding the child through the g-tube at home.

After the conclusion of testimony and argument, the juvenile court found the allegations in a second amended petition to be true and ordered the children to remain in out-of-home care with family reunification services to be provided to mother and father. The service objectives of the case plan required mother to meet the child's physical, emotional, medical, and educational needs, accept responsibility for her actions, and comply with medical treatment. Mother was also responsible for completing any recommended mental health treatment, parenting program, and demonstrating her ability to feed the child as recommended by doctors. A six-month review hearing was set for September 23, 2021.

***Family Reunification Period***

The agency's six-month status review report, filed September 13, 2021, recommended that family reunification services continue for both parents. The children were placed together with relatives on April 9, 2021. The relative care provider expressed that it can be overwhelming to care for the children at times, but she was willing to care for the children because they were family. The child gained six pounds since being placed with the relative care provider, and her vocabulary was expanding. The relative care provider described the child's seizures as staring with fear for one to two minutes followed by confusion. The child was diagnosed with cardio-facial cutaneous syndrome.

The child was hospitalized in August 2021 due to complications with her g-tube. Medical staff was concerned with mother's ability to understand their recommendations,

9.

and doctors were not confident that mother was able to provide " 'informed consent' " for a surgery. Mother often claimed to understand, but she delayed medical procedures by not providing consent timely. Mother indicated the doctors should just feed the child by mouth, however, the child was only able to pass liquids by mouth since the age of two. It was her belief that the child would learn to eat by mouth if given the chance.

Both parents were minimally compliant with their case plan. The agency was unable to obtain information regarding mother's progress in mental health services. Mother had not demonstrated the skills learned from her parenting class during her visitations with the children. Mother and father engaged in arguments in front of the children during visits. Mother struggled with the child's many tantrums during visitation, and the child became more upset as mother became easily frustrated with her. The relative care providers had to intervene during the child's tantrum in order to calm the child.

At a Child Family Team Meeting, mother claimed she questioned doctors and delayed giving consent for the child's treatment because she believed there were alternative treatments available for the child. Mother became upset and left the meeting after indicating that she would not be giving consent for future surgeries. The agency determined that return of the children to mother's care would be detrimental based upon mother's failure to understand the importance of following the recommendations of the child's medical professionals. Any delays in the child's medical treatments were seen as potentially fatal due to her failure to thrive diagnosis.

The six-month review hearing was set for a contested hearing at the request of father for October 5, 2021. On September 28, 2021, the agency requested authorization for the child to undergo a medical procedure requiring general anesthesia. Mother declined to consent to the procedure, and hospital staff did not believe that mother either understood or was fit to consent to the procedure. Mother continued to ask the medical staff to feed the child through her mouth despite repeatedly being informed that the child

10.

cannot be fed.  The juvenile court granted the request as recommended that the surgical/medical treatment be authorized by the child's medical team at Valley Children's Hospital.  At the contested six-month review hearing on October 5, 2021, father withdrew his contest and all parties submitted on the agency's recommendation.  The juvenile court ordered continued family reunification services for mother and father, and it set the next review hearing for March 29, 2022.

The report prepared for the 12-month review hearing recommended that family reunification services be terminated for mother and father and a section 366.26 hearing be set.  The children remained placed in the home of their relative care provider, and the child was discharged from the hospital on October 8, 2021, after treatment for an abdominal distension and small bowel obstruction.  The child was diagnosed with Noonan's Syndrome and Cardiofaciocutaneous Syndrome.  She was tolerating her feedings and doing well since her discharge from the hospital.

Mother and father were living together in an apartment while mother acted as father's caretaker due to his ongoing medical care.  During the review period, mother sporadically attended counseling and failed to take her prescribed medication.  She did not follow up with her psychiatrist because she did not believe he could help her.  Mother's therapist informed the social worker that mother lacked the ability to fully understand the extent of certain situations.  The lack of understanding was believed to be from a possible learning disability or untreated mental health.

During supervised visits, mother had a difficult time starting the child's scheduled feeds, and she needed several reminders from others to comply.  Mother was observed asking the child if she wanted to eat in order to determine if she should feed the child instead of following her schedule.  The child's relative care providers were concerned that mother had not demonstrated her ability to meet the child's medical needs by complying with the feeding schedule and changing her colostomy bag.  The agency was

also concerned with mother's inability to manage the children's behaviors, accept support from service providers or family, and cope in stressful situations.

J.R. expressed his desire to return to the home of his parents, but he enjoyed living with the relative care providers. Both children were observed to have a strong bond with the relative care providers, and the concurrent plan for both children was adoption. The relative care providers wanted nothing but the best for the children, and they desired a plan of adoption.

A contested 12-month review hearing was set for April 6, 2022, at the request of mother and father. At the contested hearing, both parents testified regarding their progress in services. Mother testified that she completed her parenting class, obtained a new therapist, and was taking medication for her mental health. She felt comfortable feeding the child without any assistance, and she believed she was ready for unsupervised visitation with the child. Mother's counsel requested the juvenile court continue family reunification services for her to participate in unsupervised visits and demonstrate her ability to provide for the child's medical needs. The juvenile court adopted the agency's recommendation and terminated family reunification services to mother and father. A section 366.26 hearing was scheduled for July 27, 2022.

***Selection and Implementation Hearing***

On July 15, 2022, mother filed a section 388 petition requesting the children be returned to her care.[3] The petition alleged mother's circumstances changed because she received training for the child's g-tube and colostomy bag. It further alleged that mother realized the importance of school and doctor's visits. The children's best interests were alleged to be served because the children would be happier at home with mother and father.

_____

[3] Father also filed a section 388 petition requesting that the children be returned home.

On July 18, 2022, mother's counsel filed a section 388 petition requesting additional reunification services based upon the following alleged change of circumstances: attendance of therapy appointments, completion of a psychiatric evaluation, receipt of professional medical training, and confidence in feeding and changing the child. The order for continued reunification services was alleged to be in the children's best interests because she continued to visit and the children were bonded to mother. Attached to the petition was a psychiatric evaluation, a letter indicating mother attended "GJ-Tube Teaching" with a nurse from the hospital, and a mental health attendance report.

The juvenile court denied the July 15, 2022, section 388 petition because the petition filed by mother's counsel was set for a hearing on July 27, 2022, to determine if an evidentiary hearing would be granted on the request for additional reunification services.

The section 366.26 report, filed by the agency on July 20, 2022, recommended that the juvenile court establish a permanent plan of legal guardianship for J.R. As to the child, the agency recommended that mother and father's parental rights be terminated and a plan of adoption be ordered. The child, now nine years old, remained placed in the home of the relative care providers with J.R. The child was hospitalized twice in May and June 2022, but she continued to put on weight and appeared to be happy. More than 15 months had elapsed since the children's placement in the relative care providers' home, and there were no observed concerns regarding the placement. The child showed affection by giving the relative care providers hugs and kisses, and she was playful with them. J.R. expressed his desire to live with his parents, but he had no worries or concerns in relation to the placement.

The report noted that mother participated in weekly supervised visits with the children for two hours per week from February 2021 through June 2022. In July 2022, visitation occurred every other week, and mother was consistently observed to be on time

and engaging with the children. Social workers did have to intervene when J.R. tried to manipulate mother by becoming angry or loud. In recent visits, mother met the child's medical and physical needs, and no significant concerns were noted in the last three months of supervised visitations. However, mother, father, and relative care providers engaged in a verbal altercation that upset the child prior to an attempted visit outside of the agency's supervision. The relative care providers left the visit with the child because they were concerned she would pull out her feeding tube or harm herself.

The child was described as an adorable, strong-willed female of Black, Caucasian, and Hispanic descent. She was nonverbal and often motioned when she was expressing herself. The child had been diagnosed with autism, global developmental delays, craniofacial syndrome, seizure-like activity, failure to thrive, feeding tube dependent, hypoglycemia, constipation, and fecal impaction. She required specialized care and attention, and she had a significant history of hospitalizations. The child was excited to see her mother, and she transitioned easily to and from visits. She was observed to be happy, playful, and content with her relative care providers. The agency believed the child was "specifically adoptable" due to her significant medical and developmental concerns.

The relative care providers were willing to adopt both children to keep them with their family. The agency considered J.R. to be adoptable due to his young age and lack of significant medical or developmental concerns. At almost 11 years of age, J.R. indicated that he would refuse to sign adoption papers in the event he turned 12 years old prior to the finalization date. He was in agreement with a permanent plan of legal guardianship if he could not be returned home.

The children lived with their maternal grandfather, maternal grandmother, and maternal aunt, who resided in the home together to care for the children. The maternal grandmother and maternal aunt were cleared as the resource family parents, and the maternal grandfather was cleared as another adult in the home. The agency was working

14.

to approve the maternal grandfather as a resource family parent, but the process would not be completed by the section 366.26 hearing. The relative care providers expressed an openness and commitment to providing the children permanency through either a plan of adoption or legal guardianship.

On July 27, 2022, a combined hearing regarding the section 388 petition and section 366.26 hearing was held with both parents present. The agency's counsel requested a continuance for the agency to respond to the section 388 petition for additional reunification services. Mother's counsel requested to proceed on the section 388 petition that she filed on mother's behalf, and the juvenile court noted its previous denial of mother's initial section 388 petition. The hearing was continued with the agreement of the parties to August 17, 2022.

The agency filed a report in response to mother's section 388 petition, which recommended mother's petition be denied. The report detailed mother's child welfare history, the circumstances that led to the removal of the children, and current information on the family. The social worker observed the child articulating single words, short sentences, and gestures, but she was not able to describe her feelings, thoughts, or wishes. The child became excited and stated, " 'Go see Mom!' " when the social worker reminded her of an upcoming visit with mother. However, she became upset when the social worker clarified that the visit was not until the next day.

On August 2, 2022, mother, father, and the child participated in a two-hour make-up visit. The child responded excitedly to mother, but she did not respond to father. She became upset when mother went to get father's phone from the car. Mother addressed the child's medical needs and offered her liquid through her feeding tube. The child was excited about bringing hair supplies to allow mother to style her hair, but they did not style the child's hair. The family sat and watched television throughout the visit without significant interactions.

The social worker met with mother to discuss her prior and current efforts to engage in services. Mother disclosed participating in individual counseling every other week and psychiatric services once per month for her psychotropic medications. She believed one of her medications helped with her mood while the other was intended to help her quit smoking. Mother completed a training for the child's colostomy bag in October 2021, which was prior to her family reunification services being terminated. In June 2022, she completed a training for the child's feeding tube, and she learned that she had to pay attention to every single detail regarding the child's feedings. She believed the child was ready to return to her care fulltime, and she just needed more time to show the juvenile court that the children could return home safely. Mother would need the support of a nurse or trained person to assist with caring for the child on occasion.

The agency did not believe the children's best interests would be served by delaying the children's permanent plans to offer family reunification services to mother. The social worker observed that mother continued to be overwhelmed while the children were in her care for two-hour supervised visits, and mother had not shown an ability to meet the children's needs for extended periods of time. The report concluded that the mother's section 388 petition should be denied because mother had not yet mitigated the circumstances that led to the children being removed from her care.

On September 1, 2022, the juvenile court held a contested hearing on mother's section 388 petition and the section 366.26 hearing after multiple continuances. The juvenile court began the hearing by allowing the parties to argue whether an evidentiary hearing should be granted for mother's section 388 petition. After hearing argument from counsel and considering the petition and current reports, the juvenile court denied mother's request without an evidentiary hearing. The juvenile court determined that mother's circumstances were "changing" rather than "changed," and it further found that there was insufficient evidence that additional family reunification services would be in the children's best interests.

16.

The selection and implementation portion of the hearing then began with testimony from father. Father was opposed to the legal guardianship for J.R. because he believed himself and mother were good parents. The assigned social worker testified regarding her experience, and she was found to be an expert witness in child welfare adoptions. The social worker believed that the agency would be able to find a home that was willing to take placement of both children with their respective permanent plans if the relative care providers were unable to adopt.

The child's significant medical needs were described by the social worker, and she believed that another adoptive home could be located for the child if the relative care providers were not able to adopt the child. The social worker previously had children with significant medical needs on her caseload, and there were care providers all over the state that the agency connected children with in the past. The care providers are generally nurses or other persons trained in caring for medically needy children. The maternal relatives were currently identified as persons that were interested in meeting the child's high level of care and providing a plan of adoption. In the social worker's professional opinion, it would not be detrimental to terminate the child's parental rights because she was well-adjusted and comfortable in her current home. The child looked forward to visits with mother, but she grew weary of the visit and wanted to go home as the visit progressed.

Finally, mother testified that the child calls her "[m]om," and she runs to give her a hug at the beginning of visits. Supervised visits between mother and the child took place every other week, and mother fed the child through her feeding tube and changed her colostomy bag. Mother believed the child looked "[d]efeated" at the end of visits because she had to leave. Her preference was for the juvenile court to order guardianship instead of adoption for the child.

After hearing argument from all counsel, the juvenile court proceeded to its ruling on the section 366.26 hearing after a recess. The juvenile court began with the first issue of the children's adoptability by stating as follows:

> "I don't believe today that there's any question about that. There is no evidence that the Court has before it that the children aren't adoptable. They are with maternal family who wish to adopt. And according to testimony, if the maternal relatives that currently have care are unable or unwilling at some point to adopt, there are other relatives that have also stepped forward and indicated that they would be willing to do so. That in and of itself establishes sufficient evidence that the children are adoptable, and I don't think there's been any argument that they are not."

The juvenile court agreed with the agency's recommendation that a plan of legal guardianship was the most appropriate plan for J.R. based upon his wishes. In regard to the child, the juvenile court found there was clear and convincing evidence that the child was adoptable. Next, the juvenile court turned to the beneficial parent-child relationship exception to adoption. It began by acknowledging the recitation of the law by agency's counsel, which relied upon the California Supreme Court's recent guidance in the case of *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). The juvenile court agreed with all counsel that mother and father established the first prong of the exception through regular visitation and contact with the child.

In considering the existence of a substantial positive, emotional attachment between the child and parents, the juvenile court acknowledged that there appeared to be an attachment and relationship from the description of the parents' visits. However, it was uncertain that the parents met their burden to provide evidence of a substantial positive, emotional attachment. The juvenile court summarized the "very difficult" issues in the case relating to the child, and it determined that the child's unique circumstances required an even greater need for permanency and stability.

The juvenile court concluded that it was unable to find that termination of parental rights would be detrimental given the benefits provided to the child by a permanent and

18.

stable adoptive home.  It proceeded to follow the agency's recommendation and terminated the parental rights of mother and father and selected a plan of adoption for the child.

## DISCUSSION

### I.   DENIAL OF SECTION 388 PETITION

Mother contends the juvenile court erred when it failed to grant her section 388 petition requesting additional reunification services.  She argues that her petition and supporting documentation showed a material change in her circumstances.

#### A.   Legal Principles

A petition to modify a juvenile court order under section 388 must allege facts showing new evidence or changed circumstances exist and changing the order will serve the child's best interests.  (§ 388, subd. (a); *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.)  The petitioner has the burden of proof by a preponderance of the evidence.  (Cal. Rules of Court, rule 5.570(h)(1)(D).)  In assessing the petition, the juvenile court may consider the entire history of the case.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

Section 388 serves as an " 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights.  [Citation.]" (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528 (*Kimberly F.*).)  "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation] . . . ." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

"The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate.  [Citations.]  In other words, the problem that initially brought the child within the dependency system must be removed or ameliorated.  [Citation.]  The change in circumstances or new evidence must be of

such significant nature that it requires a setting aside or modification of the challenged order. [Citation.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.]" (*In re Casey D*. (1999) 70 Cal.App.4th 38, 47.)

When determining whether a modification under section 388 would be in the best interests of the child, courts have considered several factors including but not limited to: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. . . ." (*Kimberly F*., *supra*, 56 Cal.App.4th at p. 532.)

## B. Standard of Review

We review the denial of a section 388 petition after an evidentiary hearing for abuse of discretion. (*In re Stephanie M*., *supra*, 7 Cal.4th at p. 318.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*Id*. at pp. 318–319.) " 'The denial of a section 388 motion rarely merits reversal as an abuse of discretion.' " (*In re Daniel C*. (2006) 141 Cal.App.4th 1438, 1445.) Where there is conflicting evidence, we reverse only if the evidence compels a finding for the appellant as a matter of law. (*In re I.W*. (2009) 180 Cal.App.4th 1517, 1527–1529.)

## C. Analysis

In the present case, the juvenile court determined that mother did not prove the existence of a change in circumstance or the children's best interests were served by granting her request. Mother provided evidence that she was regularly attending

counseling, participated in a feeding-tube training, and participated in a psychiatric evaluation in the four months following the termination of her reunification services.

Citing to *Kimberly F.*, mother argues that the juvenile court's denial of her section 388 petition prevented her from giving testimony regarding a variety of factors affecting the children's best interests. In *Kimberly F.*, the Court of Appeal rejected a trial court's use of a simple best interests test – of comparing the household and upbringing offered by the natural parent or parents with that of the caretakers – in analyzing a section 388 petition. (*Kimberly F.*, *supra*, 56 Cal.App.4th at pp. 526–530.) The appellate court then determined a list of factors that may be considered: the seriousness of the problem leading to dependency and the reason that problem was not overcome by the final review; the strength of relative bonds between the dependent children to both parent and caretakers and the length of time a child has been in the dependency system in relationship to the parental bond; and, the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. (*Id.* at pp. 530–532.)

Here, it cannot be disputed that mother was engaged during visits with the children, and she was participating in counseling and psychiatric appointments. These facts were understood and acknowledged by the juvenile court. The reasons provided by the juvenile court in denying mother's request related directly to the "seriousness of the problem which led to the dependency," and the "degree to which it actually has been" ameliorated. (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.) The juvenile court also properly focused on the children's permanence and stability when it considered mother's request to delay the children's proposed permanent plans.

Mother's argument that her bond with the children and participation in mental health treatment required resumption of reunification efforts ignores the legally required shift in focus once her prior efforts failed. Mother's section 388 petition contemplated further delay in permanency for children that had remained in out-of-home care for more

21.

than 18 months. Although mother had begun making progress by participating in regular counseling, a psychiatric evaluation, and a medical training, the circumstances before the court showed that mother still lacked the ability to provide care for the child on a full-time basis.

We acknowledge that mother's continued progress in treating her mental health and learning about the child's medical care indicates that her circumstances are changing, and mother's continued efforts are to be commended. However, mother must demonstrate "*changed*, not changing, circumstances." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.) Thus, it was reasonable for the court to conclude mother's recent efforts in the few months prior to the termination hearing evidenced "changing" rather than "changed" circumstances, particularly in light of her lengthy history of receiving court-ordered services in two separate dependencies involving the child. Because mother did not make a prima facie showing that circumstances had changed in the four months following the review hearing, the juvenile court properly denied her section 388 petition without an evidentiary hearing.

In the context of an 18-month dependency for the children, mother's sincere efforts to continue visits and counseling demonstrated changing, but not changed, circumstances. The child was still in a vulnerable but improving state with her various medical and developmental conditions, and the child already endured months of uncertainty while in out-of-home care. Considering the child's heightened need for permanence and stability, and the inability of mother to demonstrate her ability to meet the child's needs, the juvenile court's decision to forego additional reunification efforts was not arbitrary or beyond the bounds of reason. Accordingly, we find the juvenile court did not abuse its discretion in denying the section 388 petition.

## II. ADOPTABILITY

Mother also challenges the sufficiency of the evidence to support the juvenile court's finding that the child is adoptable. She contends the juvenile court misunderstood

the correct standard, the evidence suggested uncertainty as to who would be adopting the child, and improperly relied upon evidence that other individuals would be willing to adopt the child.

### A. Legal Principles

Once the juvenile court sets a hearing pursuant to section 366.26 to select and implement a permanent plan for a dependent child, the agency must prepare an assessment, frequently referred to as an adoption assessment. "Such an adoption assessment provides the information necessary for the juvenile court to determine whether it is likely the child will be adopted [citation] and to consequently order termination of parental rights." (*In re G.M.* (2010) 181 Cal.App.4th 552, 559.) The assessment must include "[a] preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent." (§ 366.21, subd. (i)(1)(D).) "A child's current caretaker may be designated as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process. (§ 366.26, subd. (n)(1).)" (*In re G.M.*, *supra*, at p. 559.)

At the section 366.26 hearing, the juvenile court must determine by clear and convincing evidence whether it is likely the minor will be adopted. (§ 366.26, subd. (c)(1).) If the court finds a likelihood of adoption, the court must terminate parental rights absent evidence termination would be detrimental to the minor under one of the exceptions to adoption (§ 366.26, subd. (c)(1)(B)(i)–(vi)) that are not applicable here. (See *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

In determining adoptability, the juvenile court assesses the child's age, physical condition and emotional state and how these characteristics affect a prospective parent's willingness to adopt the child. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) To be considered adoptable, the child need not be in a prospective adoptive home and there need not be a prospective adoptive parent waiting to adopt. The fact a prospective

23.

adoptive parent has expressed interest in adopting the child is evidence the child's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade adoption of the minor. A prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family. (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.)

In assessing adoptability, some courts have divided children into two categories: those who are "generally adoptable" and those who are "specifically adoptable." A child is "generally adoptable" if the child's traits, e.g., age, physical condition, mental state and other relevant factors do not make it difficult to find an adoptive parent. A child is "specifically adoptable" if the child is adoptable only because of a specific caregiver's willingness to adopt. (*In re R.C.*, *supra*, 169 Cal.App.4th at pp. 492–494.) When a child is deemed adoptable only because a particular caregiver is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child. (*Id.* at p. 494.) For example, a married, but separated person may not adopt a child without the consent of the spouse. (*In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650, citing Fam. Code, § 8603.)

B.      **Standard of Review**

On appeal, we review the juvenile court's finding that a child is adoptable for substantial evidence. "[O]ur task is to determine whether there is substantial evidence from which a reasonable trier of fact could find, by clear and convincing evidence, that the minor is adoptable. [Citation.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*In re R.C.*, *supra*, 169 Cal.App.4th at p. 491.)

24.

## C.    Analysis

We address the terms "generally" and "specifically" adoptable, terms that, in our view, obfuscate the adoptability issue before the juvenile court because those terms are not mentioned in section 366.26. Further, the juvenile court is not required to assess the general and specific adoptability of a child or make such findings. Instead, section 366.26 merely requires the juvenile court to determine if the child is "likely" to be adopted within a reasonable time. The law requires the juvenile court to determine if the child is adoptable.

"Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time. [Citations.] We review that finding only to determine whether there is evidence, contested or uncontested, from which a reasonable court could reach that conclusion. It is irrelevant that there may be evidence which would support a contrary conclusion." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.) Moreover, we review the record in the light most favorable to the juvenile court's findings, and draw all inferences from the evidence that support the court's determination. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1177.)

Mother's contention that the juvenile court applied an improper standard when finding the child adoptable ignores the full context of its actual statements. The juvenile court initially stated that it did not believe there was any question that the children were likely to be adopted because no parties argued to the contrary. Its observation that "[t]here is no evidence that the Court has before it that the children aren't adoptable" merely acknowledged the parents implied concession of the issue. In fact, the juvenile court expressly concluded its discussion on adoptability by stating, "the Agency has met its burden by clear and convincing evidence that [the child] is an adoptable child." Thus, it did not apply an incorrect legal standard when finding the child was adoptable.

25.

Next, we reject mother's contention that the uncertainty regarding the maternal grandfather's status as an approved adult living in the home rather than an approved resource family parent undermined the adoption finding. The juvenile court was capable of relying on the resource family approval of the maternal grandmother and aunt in determining that the child was likely to be adopted by them. That the grandfather may have been an additional adoptive parent or another adult living in the home is immaterial to the juvenile court's finding.

Even so, mother's speculative challenge to the juvenile court's adoptability finding based on a legal impediment was not properly preserved for appellate purposes. (See *In re G.M.*, *supra*, 181 Cal.App.4th at pp. 563-564, citing *In re S.B.* (2004) 32 Cal.4th 1287, 1293 & *In re R.C.*, *supra*, 169 Cal.App.4th at p. 493, fn. 2.) Mother did not object to the adequacy of the agency's assessment, nor did she question the social worker whether the maternal grandmother in fact had her husband's consent to adopt the children. To conclude that either the maternal grandfather would not consent to the adoption or maternal grandmother and aunt were unable to adopt the child would be drawing inferences contrary to the juvenile court's ruling. Mother argues nevertheless, relying on *In re Valerie W.* (2008) 162 Cal.App.4th 1 (*Valerie W.*), there was insufficient evidence that the maternal grandmother and aunt were able to jointly adopt the child.

In *Valerie W.*, a mother and her adult daughter applied jointly to adopt two children, one with a potentially serious genetic or neurological disorder and the other with emotional problems. (*Valerie W.*, *supra*, 162 Cal.App.4th at pp. 5–7, 11, 14.) The children were considered adoptable only because the mother and her daughter were willing to adopt. (*Id*. at p. 15.) The agency failed, however, to provide sufficient evidence that either the mother or her daughter would be willing or able to adopt the children if the other were found unsuitable, or to identify another prospective adoptive parent. The appellate court concluded there was insufficient evidence to support the court's adoptability finding and remanded the case to the juvenile court. (*Id*. at pp. 13–

26.

16.)  Here, there was no evidence the maternal grandmother or aunt's suitability to adopt depended on the other or that either was unwilling or unable to adopt the child as a single adoptive parent.  Thus, at a minimum, the juvenile court could find the child was adoptable because she had prospective adoptive parents committed to adopting her.

In addition, we reject mother's claims that the juvenile court's additional reliance on evidence of other relatives being willing to step forward or the agency's ability to locate alternative adoptive placements was in error.  The common factor in the cases cited by mother to support this argument was the fact that the children were not yet placed with prospective adoptive parents.  (See *In re Amelia S.* (1991) 229 Cal.App.3d 1060, 1065 ["the permanency hearing report indicated a few foster parents were *considering* adoption"]; see also *In re B.D.* (2008) 159 Cal.App.4th 1218, 1234 ["this is not a case in which the children had any previous relationship with a family interested in adopting them"].)  This is not a case where the juvenile court relied solely on the availability of alternative adoptive placements to support its finding of adoptability.  Accordingly, the juvenile court's finding that the child was likely to be adopted by resource family approved relative care providers, who had been committed to the child for the past 15 months, was supported by substantial evidence.

## III.    BENEFICIAL PARENT-CHILD RELATIONSHIP EXCEPTION

Mother's final contention is that the juvenile court erred when it did not apply the beneficial parent-child relationship exception to adoption.  Mother asserts that the juvenile court improperly considered mother's inability to resolve the issues that led to removal when balancing potential detriment from termination against the benefits of adoption.

### A.    Legal Principles

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies.  (§ 366.26,

27.

subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i).)

A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies. (*In re Melvin A*. (2000) 82 Cal.App.4th 1243, 1252.) Thus, the parent must prove three elements in order to prevail under the beneficial relationship exception: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C*., *supra*, 11 Cal.5th at p. 631.)

The first element of the beneficial relationship determination asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders. (*Caden C*., *supra*, 11 Cal.5th at p. 632.) The focus is on the best interests of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact. (*Ibid*.)

The second element of the exception asks whether the child would benefit from continuing the relationship. (*Caden C*., *supra*, 11 Cal.5th at p. 632.) The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid*., quoting *In re Autumn H*. (1994) 27 Cal.App.4th 567, 576.) The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C*., at p. 632.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the

28.

child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Potential negative effects from severance of the relationship might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Ibid.*) An adoptive home might provide a new source of stability that alleviates emotional instability and preoccupation leading to those problems, making the loss "not, at least on balance, detrimental." (*Ibid.*) Under this element, the court is again guided by the child's best interests, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid.*)

In *Caden C.*, the court held "that because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 625–626.) Rejecting that conclusion, our Supreme Court found "[t]he Court of Appeal did not explain how the parent's struggles related to the specific elements of the statutory exception: the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Id.* at p. 626.) A parent's struggles with issues that led to dependency were determined to be relevant only to the extent they inform whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it." (*Id.* at p. 638.)

### B. Standard of Review

Appellate courts review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id.* at pp. 639–640.) The juvenile court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for an abuse of discretion.

29.

(*Id*. at p. 640.)  "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard.  A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

The standard of review of a court's determination that a parent did not meet his or her burden to prove an exception to termination of parental rights is "whether the evidence compels a finding in favor of the appellant as a matter of law."  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)  Specifically, the question is "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

**C.    Analysis**

In the present case, the juvenile court determined that neither parent met their burden of proof as to the application of the beneficial parent-child relationship exception. The parties acknowledge the juvenile court's finding that mother visited regularly. However, the juvenile court did not find that there was sufficient evidence that maintaining the child's relationship with mother and father outweighed the benefits of adoption to establish the exception.

Mother cites to the cases of *In re B.D.* (2021) 66 Cal.App.5th 1218 and *In re J.D.* (2021) 70 Cal.App.5th 833, in support of her contention that the juvenile court's orders must be reversed for improper consideration of the circumstances that led to the child's removal.  In *In re B.D.*, a juvenile court noted that "the social worker's report stated that the paternal grandmother met the children's daily needs and opined that the parents were 'currently not in a position where they are able to take on the parental role.' " (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1229.)  The juvenile court also emphasized the parents' failure to complete the reunification plan and their continued untreated substance abuse

30.

issues. (*Id*. at pp. 1228, 1229–1230.) The *In re B.D.* court found the juvenile court's reliance on the fact that the paternal grandmother provided for the children's daily needs and the parents were unable to meet the children's needs to be "concerning because it is unclear what weight the juvenile court placed on these conclusions when balancing the harm of severing the natural parent-child relationship to the benefits of a new adoptive home in the crucial third step of the analysis." (*Id.* at p. 1230.) The appellate court reversed, without conducting a harmless error analysis, so the juvenile court could conduct a new parent-child relationship exception analysis in light of *Caden C.* (*Id*. at p. 1231.)

Similarly, in *In re J.D.*, the appellate court concluded that it was unclear to what extent the juvenile court—there, acting before *Caden C.*—considered improper factors at the second step of analyzing the parent-child beneficial relationship exception, and it reversed and remanded for a new section 366.26 hearing in accordance with *Caden C.* (*In re J.D.*, *supra*, 70 Cal.App.5th at pp. 865, 870.) Specifically, it observed that the juvenile court had appeared to improperly consider "the mere fact [that mother] had been unable to succeed in overcoming her parenting struggles," "the suitability of [the minor's] current placement," the minor's attachment to his current caregiver, and the court's determination that mother did not occupy a " 'parental' " role—all factors improper under *Caden C.* (*In re J.D.*, at pp. 864-865.)

The cases cited by mother are distinguishable because the juvenile court in this case did not refuse to apply the beneficial parent-child relationship exception based solely on the mother's failure to make "sufficient progress in addressing the problems that led to dependency." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) A parent's "continued struggles" with the issues that led to dependency cannot, "standing alone," be a bar to the parental-benefit exception. (*Ibid.*) However, a parent's struggles with the issues that led to the dependency are "relevant to the application of the [parental-benefit] exception" because it may be probative of whether interaction between parent and child has a negative effect on

31.

the child. (*Ibid*.) "A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child" (*ibid*.), while "[c]onversely, a parent who gains greater understanding of herself and her children's needs through treatment may be in a better position to ensure that her interactions with the children have a ' "positive" . . . effect' on them" (*id*. at pp. 637–638).

The cases cited by mother are inapposite because the child's section 366.26 hearing was held in September 2022, more than one year after *Caden C.*, so the juvenile court had the benefit of the Supreme Court's analysis, which was cited in the juvenile court's ruling. Furthermore, the juvenile court in this case did not refuse to apply the beneficial parent-child relationship exception based upon mother's failure to adequately address the issues that led to the child's removal. In considering the third prong of the beneficial parent-child relationship exception here, the juvenile court stated as follows:

> "The issues in this case related to [the child] are very difficult. The mother has done her best to care for [the child], and unfortunately that is— or the inability to care for her and meet her needs was the thing that resulted in the Agency and the Court being involved with this family. [The child] has serious special needs, she has to be fed 16 out of 24 hours a day. And in the beginning of this case I think that, even according to [mother's counsel], that it was very difficult for the mother to understand or be able to comply with [the child]'s needs. . . . I think maybe it just was difficult for the mother to appreciate the gravity of [the child]'s situation, and she has now been out of the mother's care for 14 months, she's been living with a relative care provider, who is very able and very capable of providing the type of care that [the child] needs to have. [¶] Given the fact that [the child], probably more than maybe other children, given her special needs she probably needs permanency and stability even more. [¶] The Court is unable, based upon the information that is before me, to make a finding as to [the child] that terminating the parental rights of her parents would be so detrimental to her that I should not terminate parental rights, and have— give her the benefit of a permanent and stable adoptive home."

We do not find that, in making its determination, the juvenile court abused its discretion by relying on impermissible factors. The juvenile court's ruling at the combined section 388 and section 366.26 hearing gave no indication that it relied on

mother's "continued struggles" to bar the parent-child relationship exception. Viewed in its context, the juvenile court considered the child's need for stability based upon the gravity of the problem that led to removal in evaluating the third prong of the exception. On balance, it concluded that ongoing interactions while mother continued making positive changes to her life was not as beneficial as the child's greater need for stability.

The evidence in the record weighed in favor of the preferred permanency option of adoption. Given the fact that the child was still relatively young, had extensive medical and developmental needs, showed no distress when separating from mother, and was bonded to her relative care providers, we find the juvenile court did not abuse its discretion. Under these circumstances, the juvenile court's ruling is entitled to a presumption of correctness, and remand is unwarranted. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Therefore, the juvenile court did not err in declining to apply the beneficial parent-child relationship exception, and its orders terminating mother and father's parental rights were proper.

## DISPOSITION

The juvenile court's orders are affirmed.

DETJEN, Acting P. J.

WE CONCUR:


MEEHAN, J.


SNAUFFER, J.

33.